IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| HELENA PEARL KYGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-4179-CV-C-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Helena Kyger seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in finding plaintiff's subjective complaints of pain not credible, in determining plaintiff's residual functional capacity, and improperly finding that plaintiff can perform her past work. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

I.     *BACKGROUND*

On February 24, 2009, plaintiff applied for disability benefits alleging that she had been disabled since December 17, 2008. Plaintiff's disability stems from seizures, headaches, fatigue, confusion, poor vision, and difficulty with balance. Plaintiff's application was denied on May 30, 2009. On March 29, 2010, a hearing was held before an Administrative Law Judge. On July 23, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On May 20, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than

2

twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cary Barlow, Ph.D., in addition to documentary evidence admitted at the hearing.

3

## A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1994 through
2009:

| Year | Earnings | Indexed |
|------|----------|---------|
| 1994 | $   691.22 | $   1,124.74 |
| 1995 | 10,729.80 | 16,786.51 |
| 1996 | 7,933.22 | 11,832.65 |
| 1997 | 8,307.51 | 11,707.76 |
| 1998 | 14,818.63 | 19,845.20 |
| 1999 | 16,521.90 | 20,958.26 |
| 2000 | 22,020.12 | 26,469.09 |
| 2001 | 3,897.63 | 4,575.94 |
| 2002 | 27,264.08 | 31,691.09 |
| 2003 | 4,788.49 | 5,433.21 |
| 2004 | 0.00 | 0.00 |
| 2005 | 3,341.17 | 3,494.74 |
| 2006 | 9,752.36 | 9,752.36 |
| 2007 | 13,184.99 | 13,184.99 |
| 2008 | 3,943.71 | 3,943.71 |
| 2009 | 0.00[1] | 0.00 |

---

[1]The record shows that plaintiff earned $4,315.00 during 2009 (Tr. at 124); however,
plaintiff testified that she earned no income during that year.  The ALJ found that plaintiff
worked some after her alleged onset date of December 17, 2008, but it did not amount to
substantial gainful activity. He did not discuss this as far as plaintiff's credibility; therefore, it

4

(Tr. at 120-121).

**Function Report - Adult**

In an undated Function Report, plaintiff reported that she does laundry (Tr. at 158). She goes out daily, either walking or riding in a car (Tr. at 159). When asked if she drives, plaintiff checked "yes" and wrote, "only if I don't have a headache and I'm feeling good." (Tr. at 159). She takes her son to the park by walking, and she does it three to four times a week (Tr. at 160).

Her condition affects her ability to bend, stand, walk, talk, see, complete tasks, concentrate, understand, use her hands, get along with others, and it affects her memory (Tr. at 161). It does not affect her ability to lift, squat, reach, sit, kneel, hear, climb stairs, or follow instructions (Tr. at 161).

**Supplemental Questionnaire**

In a Supplemental Questionnaire dated March 2009, plaintiff indicated that she had not received any treatment since she filed her claim (Tr. at 164) nor did she have any upcoming appointments (Tr. at 164). She indicated she is able to do puzzles with her son for 20 minutes at a time, she has a valid driver's license, and she is currently able to drive but does not for fear of seizures (Tr. at 165).

**Function Report Adult - Third Party**

Plaintiff's sister, Christine Kidwell, completed a Function Report on March 20, 2009 (Tr. at 167-174). She described plaintiff's typical day: "Gets her son ready for school, watches television, gets her son off the bus and she occasionally does laundry and cooks, and gets son ready for bed." (Tr. at 167). She indicated that plaintiff gets her son ready for school, "feeds and bathes him" (Tr. at 168). However, when asked what plaintiff was able to do before her

---

does not seem to make any difference whether plaintiff earned income in 2009 or not.

5

illness that she cannot do now, Ms. Kidwell wrote, "Do laundry, gets Michael ready for school and for bed" -- precisely the things she said plaintiff is still able to do (Tr. at 168). She reported that plaintiff has no problems with personal care (Tr. at 168). She said plaintiff can prepare her own meals and it takes her an hour, she takes her son to the park every day and takes him on walks (Tr. at 169, 171). Plaintiff's condition affects her ability to understand, talk, use her hands, stand, complete tasks, and concentrate and it affects her memory (Tr. at 172). The condition does not affect plaintiff's ability to lift, sit, climb stairs, squat, kneel, bend, follow instructions, hear, reach, see, get along with others, or walk (Tr. at 172).

### Statement of Other Person

On February 16, 2010, plaintiff's mother, Kathleen Kidwell, completed a Statement of Claimant or Other Person (Tr. at 288-289). She stated as follows:

> When my daughter has a migraine she becomes very sick, hurting, throwing up. Sometimes she can't see and is very irritable, and this sometimes happens up to 4 times a week and can last up to 12 hours. My daughter can't do the things like work and sometimes taking care of her and her son because of the migraines and the seizures. I do that because since this they have moved back in with me.

### B.    SUMMARY OF MEDICAL RECORDS

On March 14, 2007, plaintiff was seen at the emergency room at Columbia Regional Hospital reporting low back pain (Tr. at 231). Plaintiff said she hurt her back "in August," had physical therapy, but two days ago it had started hurting again. She was given IV Valium[2] and Darvocet[3] (Tr. at 229). When she left the ER, she rated her pain a 5/10 (Tr. at 230).

Nine months later, on December 12, 2007, plaintiff was seen at the emergency room at Columbia Regional Hospital complaining of back pain (Tr. at 207). She had stepped on something and fallen back on a fence two days earlier. She told the doctor that she has lower

---

[2]Valium is a brand name for Diazepam which is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal.

[3]Relieves mild to moderate pain.

6

back pain and is "on opioids" (Tr. at 207). Plaintiff was given an injection of Toradol[4] and was diagnosed with muscle strain in her back and abdomen and chronic low back pain (Tr. at 208). "Weight loss recommend[ed]!" She was given prescriptions for Vicodin (narcotic) and Naprosyn (non-steroidal anti-inflammatory) and was told to discuss her chronic lower back pain and pain medications with her primary care physician.

Seven months later, on June 15, 2008, plaintiff went to the emergency room at Columbia Regional Hospital reporting that she had had a seizure (Tr. at 194-205). The seizure activity lasted two to three minutes per a family member. She complained of headaches the past two days and said she had been taking increased amounts of pain medications. She said she was suffering from anxiety, diabetes, and chronic back pain. Plaintiff was listed as a smoker; one pack per day. Plaintiff's lab work was all normal, her physical exam was normal, her EKG was normal, a CT scan of her head was normal, x-rays of her lumbar spine and heart/lungs were normal. Plaintiff had a large abrasion on her back. No seizure activity was observed in the emergency department. She was assessed with seizure-like activity and mild dehydration. It was recommended that she have an EEG and an MRI and follow up with neurology. She was given Gabapentin[5] for pain.

On August 25, 2008, plaintiff was brought by ambulance to the emergency department at the University Hospital (Tr. at 236-255). Plaintiff's sister called an ambulance after observing seizure activity for two and a half to three minutes. "Patient reports feeling confused currently, but she states this is confusion regarding why she is having seizures." Plaintiff reported smoking a pack of cigarettes per day for the last ten years, and said she uses marijuana "off and on," last using it about two to three weeks ago. Plaintiff's liver enzymes

---

[4]Non-steroidal anti-inflammatory.

[5]Used to control seizures and also as a pain medication.

7

were high, and her blood sugar level was high. A CT scan of her head and brain were normal. Limitations on discharge were listed as follows: "Limited activity, advised no driving, elevated heights, or other activities that would put the patient at increased risk of bodily harm if she were to have another seizure." She was given a prescription for phenytoin (controls seizures). Plaintiff saw a neurologist while in the hospital (Tr. at 249-251). Registration, recall, and long-term memory were intact. She was told to have an EEG and an MRI and the follow up with the neurologist after those tests were done.

On September 19, 2008, plaintiff went to the emergency room complaining of a tooth ache (Tr. at 185-186). Plaintiff said she was taking Lorcet (narcotic) but wanted to save it for her lower back pain. Plaintiff was told to follow up with her doctor regarding her request for further pain medication: "This is a dental issue."

On October 14, 2008, an EEG was performed at University Hospital (Tr. at 228). The EEG was essentially normal in the awake and briefly drowsy states. On the same day plaintiff had an MRI of her brain which was normal (Tr. at 234).

On October 30, 2008, another EEG was performed at University Hospital (Tr. at 281). The EEG was essentially normal in the awake and briefly drowsy states.

December 17, 2008, is plaintiff's alleged onset date.

Nearly six months later, on March 9, 2009 -- plaintiff's first medical appointment after her alleged onset date -- she saw Michael Deloughery, a nurse practitioner, for medication refills (Tr. at 294-295). Plaintiff said she experiences chronic low back pain from a lifting accident in 2007. She said she had had a seizure-like event in June 2008 and again in August 2008. She denied experiencing fatigue, blurred vision, chills, sweats, or dizziness. She weighed 285 pounds on this visit. Her physical exam was normal; her mood was normal. Plaintiff's diabetes medication was refilled, but Mr. Deloughery noted that he was not able to refill her Lorcet (narcotic) or Soma (muscle relaxer).

8

On March 26, 2009, plaintiff saw Jerry Bruggeman, M.D. (Tr. at 296-297). She weighed 282 pounds. Plaintiff complained of "back pain - needs meds refilled". Plaintiff's physical exam was normal, her gait was normal, her psychological exam was normal. Dr. Bruggeman refilled plaintiff's Lorcet and Soma.

On April 24, 2009, plaintiff saw Dr. Bruggeman for a follow up (Tr. at 298-299). She reported a history of back pain but denied experiencing any pain at her appointment. Plaintiff's examination was normal. She was observed to have a normal gait and mood. Dr. Bruggeman refilled plaintiff's Lorcet.

On May 22, 2009, plaintiff returned to Dr. Bruggeman's office for a prescription refill (Tr. at 300). She complained of headaches, but said her anxiety was better. She denied experiencing any pain. Her neurological and psychological examinations were normal.

On June 5, 2009, plaintiff saw Dr. Bruggeman and said she fell while getting into a boat a week earlier (Tr. at 302-303). She had gone to the emergency room and her x-rays were normal. She reported pain at a rate of 7 out of 10. Dr. Bruggeman prescribed Vicodin (narcotic) and Soma (muscle relaxer).

On June 30, 2009, plaintiff was evaluated by neurologist, Sean Lanigar, M.D. (Tr. at 264-267). He noted that plaintiff was taking Dilantin (for seizures), hydrocodone (narcotic), clonazepam (controls seizures and panic attacks), Glyburide (for diabetes), Lisinopril (for high blood pressure), Metformin (for diabetes), and phenytoin (for seizures). "I reviewed multiple seizure auras with her, all of which she denied. Other complaints include almost daily headaches. . . . She also has multiple risk factors for stroke, including hypertension, diabetes, and a family history of stroke. Her anxiety episodes only occur in social situations. . . . The patient denies any tobacco or alcohol usage." Plaintiff's physical exam was normal.

Dr. Lanigar recommended switching plaintiff to Topamax which would treat her seizures and migraine headaches. He recommended she have a sleep study to see if she has

sleep apnea, and he told her she should be taking one aspirin per day as she has multiple stroke risk factors. Plaintiff was to start taking Topamax at 25 mg twice a day, increasing by a total of 50 mg per day per week until she reaches 100 mg twice a day, and then decrease her Dilantin by 100 mg per day per week until she is off that medication. He advised plaintiff to follow up in five to six months.

On July 7, 2009, plaintiff saw Dr. Bruggeman to discuss the results of her blood work (Tr. at 307-308). She denied experiencing any pain and her mood and neurological examinations were normal.

On August 19, 2009, plaintiff saw Dr. Bruggeman and requested medication to help her lose weight (Tr. at 309-310). Plaintiff weighed 286 pounds and denied having any pain. Her exams were normal. Dr. Bruggeman's prescribed Phentermine.

On October 16, 2009, plaintiff saw Dr Bruggeman to discuss her diet medication (Tr. at 311). She weighed 286 pounds -- the same weight from two months earlier when she first requested medication to help her lose weight. Plaintiff's mood was normal and she denied experiencing any pain.

On November 11, 2009, Dr. Lanigar completed interrogatory questions as follows:

1.      How long have you been treating Helena Kyger?

        Seen once on June 30, 2009, only

2.      Have you been treating Ms. Kyger for migraine headaches?

        I have previously tried Topamax as a prophylactic agent for her
        headaches and seizures but she had side effects. She is currently on
        [illegible][6] which has been reported to have some effect on migraines but
        in longer trials not effective. Has missed multiple follow up
        appointments to readdress her seizures and headaches.

---

[6]Plaintiff indicated in her brief that Dr. Lanigar wrote "Lamictal" which is a medication used to treat seizures. Although it does not appear to me that "Lamictal" is the word written by Dr. Lanigar, it is not relevant to this decision.

10

3.    Would Ms. Kyger's migraine headaches at all be related to her seizure disorder?

Migraine headaches can be made worse with seizures.

(Tr. at 286).

On December 1, 2009, plaintiff saw Dr. Lanigar for a follow up (Tr. at 316-319). "I scheduled her for a polysomnogram [sleep study], the patient did not show for this test. As she was also having headaches, we decided to try to transition her over to Topamax from phenytoin, to help with her headaches and possible seizure-like events. She presents today in follow up. She continues to remain on Dilantin. When she attempted to get up to a total of 100 mg twice a [day of] Topamax, she became severely tired. She stopped the medication, and only recently restarted it. She's currently on Topamax 25 mg twice a day. She continues to have excessive daytime sleepiness, and does not feel well rested after sleeping for approximately 8 hours at night. She also has headaches upon awakening, and snoring, and awakening with coughing." Plaintiff's physical exam was normal. Dr. Lanigan recommended she increase her Topamax up to 50 mg twice a day, have the sleep study done, and follow up in five to six months.

Dr. Jerry Bruggeman completed an undated narrative regarding plaintiff's treatment (Tr. at 314). The document refers to a "letter you wrote our office dated 2/2/2010", therefore, this document was prepared subsequent to that date. "Our office has seen Helena multiple times for chronic conditions, including her seizure disorder. However, not much discussion and treatment of her headaches was undertaken by our office. We had sent her to a specialist (neurologist), with whom follow up is scheduled. According to my records, her seizure disorder and headaches are being managed by the office of Dr. Lanigar at the University of Missouri."

11

*C.*      *SUMMARY OF TESTIMONY*

During the March 29, 2010, hearing, plaintiff testified; and Cary Barlow, Ph.D., a vocational expert, testified at the request of the ALJ.

1.    **Plaintiff's testimony.**

At the time of the hearing plaintiff was 35 years of age (Tr. at 27). She graduated from high school and was trained to be a certified nurse's assistant (Tr. at 27, 37). She took care of elderly people -- bathing them, feeding them, lifting them (Tr. at 27).

Plaintiff's last job was working as a housekeeper in December 2008 (Tr. at 28). She stopped working on December 17, 2008 -- her alleged onset date (Tr. at 36). That job ended because of seizures (Tr. at 28). Plaintiff's first seizure occurred in June 2008 (Tr. at 28). Plaintiff used to get headaches before she started getting seizures, but after the seizures started her headaches became more intense and she gets them "more daily" (Tr. at 28-29). When plaintiff gets a migraine, she feels off balance, dizzy and nauseous (Tr. at 29). She is fatigued when she has a headache, but otherwise she does not suffer from fatigue (Tr. at 32). She gets migraines three to four times a week and they last on average eight to nine hours but she has had them last for 12 hours (Tr. at 29). When she has a migraine she stays in a dark room by herself because she cannot stand noise (Tr. at 29, 31).

Plaintiff and her five-year-old child moved in with her mother in "early 08" because of her headaches (Tr. at 29, 30). Plaintiff testified it was "early 08" then she said "June -- it was August --" (Tr. at 29). They live in an apartment (Tr. at 30). Plaintiff's mother helps with the child when plaintiff is having a migraine (Tr. at 30). Plaintiff takes Topamax for migraines (Tr. at 31). She takes Dilantin for seizures (Tr. at 31). She has no side effects from her medication (Tr. at 31). Despite taking Topamax, plaintiff still gets migraines three to four times per week (Tr. at 31).

12

Plaintiff has diabetes and a lower back problem (Tr. at 31-32). She cannot stand or walk for very long (Tr. at 32). Plaintiff is between 5'7" and 5'8" tall and weighs about 300 pounds (Tr. at 32). She has gained 50 pounds "since this illness" because she lies in bed and does not exercise (Tr. at 32). Plaintiff takes Lorcet for her back (Tr. at 33).

Plaintiff's mom does most of the cooking (Tr. at 33). If plaintiff is feeling well, she gets her son ready for school; otherwise her mother does it (Tr. at 33). Her mom has to do it about three out of five days (Tr. at 34). When plaintiff is feeling well, she helps by loading the dishwasher (Tr. at 35). Plaintiff spends about six or seven hours of a workday lying down in a dark room resting (Tr. at 38). Out of those hours, she sleeps about two hours (Tr. at 38).

Plaintiff stopped driving when she started having seizures because she is afraid she will have a seizure while driving (Tr. at 34). She stopped driving about a year before the hearing, or March 2009 (Tr. at 34). She did some driving off and on after she had seizures, but she stopped driving altogether a year ago (Tr. at 34).

Plaintiff has not had a seizure since August 2008 (Tr. at 39).

## 2. Vocational expert testimony.

Vocational expert Cary Barlow, Ph.D., testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes cashier, which is light and semi-skilled; certified nurse's assistant, which is medium and semi-skilled but she performed it at the heavy level; and housekeeper, which is light and unskilled (Tr. at 40-41).

The ALJ told the vocational expert to assume a person who had the abilities as described by plaintiff in her testimony (Tr. at 41). The vocational expert testified that such a person could not work because the person would be "shut down" for six to seven hours a day up to four times per week (Tr. at 41-42). A person who was that undependable could not keep a job (Tr. at 42).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Thomas Bennett entered his opinion on July 23, 2010 (Tr. at 11-18).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14).  Although she worked after her alleged onset date, the work activity did not rise to the level of substantial gainful activity (Tr. at 14).

Step two.  Plaintiff suffers from the following severe impairments:  seizure disorder, migraine headaches, hypertension, diabetes mellitus type 2, mild to moderate obesity, and anxiety disorder (Tr. at 14).

Step three.  Plaintiff's severe impairments do not meet or equal a listed impairment (Tr. at 14).

Step four.  Plaintiff's subjective complaints of disabling symptoms (and those of third parties) are not entirely credible (Tr. at 15-17).  Plaintiff retains the residual functional capacity to perform medium work except she cannot work at heights or in/around dangerous equipment and moving machinery.  She cannot perform work requiring more than routine interactions with the general public (Tr. at 14).  With this residual functional capacity, plaintiff can perform her past relevant work as a certified nurse's assistant at a nursing home or at an assisted living center as that work is performed in the national economy, a housekeeper at a hotel, a cashier at a convenience store, and a psychiatric aide at a hospital as that job is performed in the national economy (Tr. at 17).

Therefore, plaintiff was found not disabled at step four of the sequential analysis.

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Specifically she argues that the ALJ ignored the notations in the medical records where plaintiff complained of "tiredness" as a side effect of Topamax which was used to control her

14

migraines. She further argues that plaintiff's mother provided third-party observations of plaintiff's limitations.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to

15

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> In February 2010, the claimant's mother reported that the claimant continues to suffer frequent migraine headaches and seizures that considerably restricts [sic] and limits [sic] her ability to perform daily functions. For the reasons set forth below, the undersigned's review of the medical evidence is not consistent with the claimant's testimony and the third-parties [sic] report of migraine headache, seizures, and other health impairments occurring at totally disabling intensity, frequent [sic], and severity.

> As shown above, diagnostic studies and physical examinations have been unremarkable for any signs of elliptic [sic] disorders or any other neurological abnormalities or deficits. After the August 2008 seizure, the claimant was initiated on the anti-convulsive medication, Dilantin. In contrast to the claimant's testimony and third-party reports of frequently occurring migraine headaches aggravated by seizures or seizure auras, a review of the available ongoing medical treatment notes of the claimant's neurologist and family practice specialist do not confirm that the claimant has suffered any additional seizures since June and August 2008. In fact, in June and December 2009, the claimant's treating neurologist reported that the claimant had not experienced any additional seizures or seizure auras. There is no medical documentation entered into the hearing record confirming that since December 17, 2008, the claimant has sought or required emergency room treatments, hospitalizations, or other crisis treatments addressing migraine headaches or seizures. In November 2009, the claimant's treating neurologist reported that the claimant had missed multiple follow-up appointments scheduled to redress he[r] seizures and migraine headaches. Thus, it appears that since December 17, 2008, the treating neurologist has only seen the claimant in June and December 2009, and that treating family practice specialist has not seen the claimant since October 2009. In addition, there is no medical documentation entered into the hearing record confirming that since late 2009 the claimant has continued to maintain or require long-term anticonvulsive and anti-migraine medication therapy to address her migraine headaches and seizures.

> There is no showing that since December 17, 2008, the claimant has suffered disabling progressions or complications of her diabetes, hypertension, obesity or anxiety. Specifically, there is no medical documentation entered into the hearing record confirming that since December 17, 2008, the claimant has suffered any strokes, myocardial infarctions, or other catastrophic events requiring emergency room treatments, hospitalizations, or other crisis treatments. In addition, there is no medical documentation entered into the hearing record confirming that since December 17, 2008, the claimant has suffered frequent or prolonged acute exacerbation of her diabetes, hypertension, obesity, or anxiety. Repeated physical examinations have persistently shown the claimant to exhibit good strength, motor functions, joint flexibility, sensory functions, reflexes, pulsation, and other physiological functions.

16

Similarly, mental status examinations have persistently shown the claimant exhibit[s] intact mental functions. The claimant has only required limited prescriptions of the anti-anxiety medication, Xanax, and her treating neurologist reported that her anxiety occurred only in social situations. She has not required referral for evaluation or treatment by a psychiatrist or other mental health specialist. The undersigned is convinced that the claimant's anxiety disorder imposes mild restrictions of activities of daily living; moderate difficulties of social function[ing]; mild difficulties of maintain[ing] attention, concentration, and pace; and no episodes of decompensation or deterioration in work or work-like settings.

In assessing the claimant's overall credibility, the undersigned notes that in addition to the clinical and diagnostic medical evidence outlined above, the hearing record contains additional evidence that is inconsistent with the claimant's subjective complaints of totally disabling health impairments and/or indicative of general lack of credibility. As shown above, in June 2009 the claimant's neurologist consulted with her concerning the long-term medical care required to address her complaints of seizures and migraine headaches, prescribed long-term medication therapy, and informed her of the need to maintain follow-up medical treatments. In addition, the claimant reports that other members of her family have suffered seizure disorders. Given claimant's knowledge of [the] need of ongoing medical treatments to controlled [sic] her chronic health impairments and her report of the intensity, frequency, and severity of her alleged seizures and migraine headaches, one would expect her demonstrated good compliance to the treatment regimens her physician prescribed to provide her control and relief.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the [sic] some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 15-17).

The evidence of record does not support plaintiff's allegations of completely disabling limitations. The ALJ found that plaintiff had severe impairments of a seizure disorder, migraine headaches, hypertension, diabetes mellitus type 2, mild to moderate obesity, and an anxiety disorder (Tr. 14). The ALJ then concluded that although plaintiff's impairments limited her abilities, her allegations of completely disabling limitations were inconsistent with the evidence of record.

Plaintiff argues that the ALJ did not provide specific reasons for finding her allegations of disabling symptoms not credible. However, the ALJ properly outlined the credibility factors

17

in accordance with the regulations and <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), and then specifically determined that plaintiff's allegations were inconsistent with her medical treatment notes, including her mild medical findings and medical noncompliance.

The Eighth Circuit has held that if an ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so, [the court] will normally defer to that judgment." <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001); <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990). Here the ALJ thoroughly evaluated plaintiff's allegations and the evidence of record before explicitly discrediting plaintiff's testimony.

Plaintiff's allegations of disabling symptoms are inconsistent with her medical treatment notes. As for plaintiff's seizures, the ALJ noted that although plaintiff alleged suffering from disabling seizures, she had not had any seizure-like activity since August 2008, more than four months prior to her alleged onset date of disability. Since that time, plaintiff's neurological examinations have been consistently normal and she has not experienced any other seizure-like activity. All of her objective medical tests, including an EEG, CT scans, and an MRI of her brain, were consistently normal. "[L]ack of objective medical evidence is a factor an ALJ may consider." <u>Forte v. Barnhart</u>, 377 F.3d 892, 895 (8th Cir. 2004).

As for plaintiff's headaches, Dr. Bruggeman, plaintiff's primary care physician, stated that he had not really treated plaintiff for headaches. Dr. Lanigar, a neurologist, stated that plaintiff had missed multiple appointments during which he was to evaluate her headaches. Failure to follow a recommended course of treatment weighs against a claimant's credibility. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 802 (8th Cir. 2005); <u>Gowell v. Apfel</u>, 2542 F.3d 793, 797 (8th Cir. 2001). Plaintiff's failure to seek consistent treatment or attend scheduled appointments for her headaches weighs against her credibility, and the ALJ properly relied on those factors. <u>Holley v. Massanari</u>, 253 F.3d 1088, 1092 (8th Cir. 2001).

Plaintiff's medical treatment notes consistently show that she had a normal gait and normal strength in her extremities. Her musculoskeletal and neurological examinations were consistently normal. Her psychological evaluations were normal. No doctor who examined plaintiff limited her abilities to a greater degree than the ALJ in his residual functional capacity assessment. A lack of significant restrictions imposed by treating physicians is properly relied on by an ALJ. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Brown v. Chater, 87 F.3d 963, 964-965 (8th Cir. 1996). See also Choate v Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) ("There is no indication in the treatment notes that either [of plaintiff's physicians] restricted his activities.").

As for plaintiff's anxiety, the record establishes that plaintiff's mood was consistently assessed as normal. In May 2009 plaintiff told Dr. Bruggeman that her anxiety was better, and a month later she told Dr. Lanigar that she only experienced anxiety in social situations. Plaintiff never sought or received treatment from a mental health professional, nor did she need to see her primary care physician on a regular basis for anxiety. The absence of any evidence on ongoing counseling or psychiatric treatment or of deterioration or change in a claimant's mental capabilities supports a finding that the claimant is not disabled. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000); Dixon v. Sullivan, 905 F.2d at 238.

As to plaintiff's medication side effects, she argues that the ALJ ignored the fact that Topamax caused plaintiff to be tired. However, plaintiff testified at the administrative hearing that she does not suffer any side effects from her medication.

Plaintiff's neurologist found her memory and recall intact. There is no finding of impaired memory in any of the medical records. Subsequent to her alleged onset date, she denied fatigue, blurred vision, and dizziness. She denied tobacco use to her neurologist when she was a pack-a-day smoker. She denied being in any pain at many of her doctor visits. She claims that her job ended on December 17, 2008, due to seizures; however, her last seizure

19

was in August 2008 and plaintiff continued to work for months after that. In addition, plaintiff continued to drive a car after she experienced seizures and did not (according to her testimony) stop driving until March 2009 -- seven months after she experienced her final seizure. Plaintiff stopped taking medication ordered by her neurologist and later told him it was due to side effects. However, she saw her primary care physician multiple times during the months between her neurology appointments and never mentioned having problems with medication that caused her to go against her treating neurologist's advice. Plaintiff failed to show for a sleep study or for multiple appointments during which her allegedly disabling headaches were to be evaluated. She testified that she spends her days in a dark room by herself, but her medical records indicate plaintiff fell while getting into a boat. The substantial evidence in the record simply does not corroborate plaintiff's allegations.

## B.     THIRD-PARTY OBSERVATIONS

Plaintiff argues that the ALJ erred in discrediting her allegations because her mother's observations corroborated plaintiff's allegations.

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.     Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.      Only acceptable medical sources can provide medical opinions.  20 C.F.R. §§
        404.1527(a)(2), 416.927(a)(2) (2007).

3.      Only acceptable medical sources can be considered treating sources.  20 C.F.R.
        §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical
sources" include nurse practitioners, physician assistants, licensed clinical social workers,
naturopaths, chiropractors, audiologists, and therapists.  "Non-medical sources" include school
teachers and counselors, public and private social welfare agency personnel, rehabilitation
counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors,
clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically
determinable impairment," according to SSR 06-3p.  Sloan v. Astrue, 499 F.3d 883, 888 (8th
Cir. 2007).   "Instead, there must be evidence from an 'acceptable medical source' for this
purpose.  However, information from such 'other sources' may be based on special knowledge
of the individual and may provide insight into the severity of the impairment(s) and how it
affects the individual's ability to function."  Id. quoting SSR 06-3p.

The courts have consistently criticized the Social Security Administration for failing to
discuss third-party statements:

> Where proof of a disability depends substantially upon subjective evidence, as in this
> case, a credibility determination is a critical factor in the Secretary's decision.  Thus,
> "the ALJ must either explicitly discredit such testimony or the implication must be so
> clear as to amount to a specific credibility finding." Tieniber v. Heckler, 720 F.2d
> 1251, 1255 (11th Cir. 1983).  See also Andrews v. Schweiker, 680 F.2d 559, 561 (8th
> Cir. 1982). In this case, the administrative law judge was, of course, free to disbelieve
> the testimony of Basinger, his wife, and the affidavits of others. Isom v. Schweiker, 711
> F.2d 88, 89-90 (8th Cir. 1983); Simonson v. Schweiker, 699 F.2d 426, 429 (8th Cir.
> 1983).  This, however, the administrative law judge did not do.  Rather, the
> administrative law judge denied disability benefits based on the lack of objective
> medical evidence.
>
> Basinger should not have his claim denied simply because he failed to see a physician
> near the time that his insured status expired.  The testimony indicated that Basinger had

21

rarely sought medical attention throughout his lifetime. Indeed, his wife stated that she did not believe that Basinger had ever been to a doctor until 1968. She explained Basinger's failure to see a doctor between 1973 and 1980 as owing partly to stubbornness, and partly to finances. A Social Security claimant should not be disfavored because he cannot afford or is not accustomed to seeking medical care on a regular basis. The failure to seek medical attention may, however, be considered by the administrative law judge in determining the claimant's credibility.

The error in this case was the failure of the administrative law judge to give adequate consideration to the objective testimony presented by the two physicians and the subjective testimony and affidavits of Basinger, his wife, and others. We do not decide the question of whether this evidence was sufficient to prove that Basinger was disabled within the insured period. Before that determination is made, the administrative law judge must judge the credibility of the witnesses. If all of Basinger's evidence is to be given credence, we believe that Basinger has at least met his initial burden of showing that he could not return to his former employment. We reverse the decision of the district court and remand this case to the Secretary for further consideration of Basinger's claim. On remand, the administrative law judge should consider all of the relevant objective and subjective evidence presented by the claimant, and if any of the evidence is to be discredited, a specific finding to that effect should be made.

Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir. 1984).

However, the fact that the courts have made this criticism on a regular basis does not mean that in every case the failure of an ALJ to analyze the credibility of third-party witnesses remand is automatic. For example, in Young v. Apfel, 221 F.3d 1065 (8th Cir. 2000), the court held that the ALJ "implicitly" evaluated the testimony of the claimant and her witnesses by evaluating the inconsistencies between her statements and the medical evidence.

[B]ecause the same evidence also supports discounting the testimony of Young's husband, the ALJ's failure to give specific reasons for disregarding his testimony is inconsequential. See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible). Finally, we find that the ALJ did not discredit the statements of Young's friends merely on the grounds that they were not medical evidence; rather, the ALJ observed that the statements were devoid of specific information that could contradict the medical evidence regarding Young's capabilities during the relevant time period.

Id. at 1068-1069.

See also Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Bates v. Chater, 54 F.3d 529, 533 (8th Cir. 1995).

The opinion at issue is a February 16, 2010, Statement of Claimant or Other Person completed by plaintiff's mother, Kathleen Kidwell, in which she stated:

> When my daughter has a migraine she becomes very sick, hurting, throwing up. Sometimes she can't see and is very irritable, and this sometimes happens up to 4 times a week and can last up to 12 hours. My daughter can't do the things like work and sometimes taking care of her and her son because of the migraines and the seizures. I do that because since this they have moved back in with me.

The ALJ did not specifically analyze the observations and opinions of plaintiff's mother; however, he mentioned plaintiff's mother's report and indicated at the beginning of his credibility analysis that the analysis applied to the third-party reports as well.

"Although specific articulation of credibility findings is preferable, we consider the lack thereof to constitute a deficiency in opinion-writing that does not require reversal [when] the ultimate finding is supported by substantial evidence in the record." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (citing Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (ALJ did not specifically outline reasons for rejecting testimony, but clear from record the ALJ made certain implicit determinations regarding credibility)).

Kathleen Kidwell's statement of observations mirrored the allegations reported by plaintiff in her administrative paperwork. Therefore, because the ALJ analyzed plaintiff's allegations and found them not credible when compared to the medical record and the other credible evidence, the same can be said of plaintiff's mother's statement.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms is not credible.

## VII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred by failing to consider plaintiff's migraine headaches -

23

- which the ALJ found to be severe -- when assessing her limitations[7] and by failing to develop the record sufficiently to permit a determination as to plaintiff's limitations in work-related activity.

It is the Commissioner's responsibility to determine the residual functional capacity based on all of the relevant evidence. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007). However, it is the claimant's burden to prove her residual function capacity. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). The ALJ concluded, based on all of the credible evidence in the record, that plaintiff retained the residual functional capacity to perform medium work except she should avoid heights, dangerous equipment, moving machinery, and work requiring more than routine interactions with the general public. These assessed limitations adequately account for a reasonable degree of limitation and are based on substantial evidence, including plaintiff's consistently normal to mild medical findings. An ALJ is only required to consider credible limitations. Owen v. Astrue, 551 F.3d 792,801-802 (8th Cir. 2008).

An ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians. Martise v Astrue, 641 F.3d 909,927 (8th Cir. 2011). Here, the ALJ thoroughly evaluated the evidence of record and made factual findings regarding this evidence. There is no indication that he felt unable to make his assessment. In fact, there is little if any contradictory medical evidence in this record. Plaintiff's doctors examined her repeatedly and consistently came up with the same findings -- her physical examinations were normal, her psychological examinations were normal, her gait was normal, her x-rays were normal, her EEGs were normal, her EKG was normal, her MRIs were normal, her CT scans were normal, she repeatedly reported no pain on many doctor

---

[7]Plaintiff also argues that the ALJ erred in failing to consider plaintiff's "tiredness" as a side effect of Topamax in deriving an RFC; however, as discussed above, plaintiff testified at the administrative hearing that she does not suffer from any medication side effects.

visits, she continued to drive after having been assessed with seizures, she failed to attend doctor appointments to have her headaches evaluated, she had only two episodes of seizure-like activity and both were months before her alleged onset of disability. The substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

When an individual can perform her past relevant work, either as she performed it or as the work is performed in the national economy, the person is not disabled. Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). The ALJ reviewed plaintiff's past work and noted that plaintiff's positions as a certified nurse's assistant, psychiatric aide, housekeeper, and cashier are all performed at the light to medium exertional level in the national economy. The ALJ's analysis is supported by the vocational expert's testimony that plaintiff's position as a certified nursing assistant is a medium exertional level job (despite plaintiff having performed it at the heavy level) and her positions as a cashier and housekeeper are light exertional level jobs. The ALJ then compared plaintiff's past positions to her medium RFC assessment and determined that plaintiff retained the capacity to perform her previous jobs as a certified nursing assistant, housekeeper, cashier, and psychiatric aide.

Plaintiff argues that the limitation against working with the general public would preclude all of those jobs except the housekeeper position. That argument is irrelevant, for even if it were accurate, plaintiff could still perform the housekeeping job and would therefore be found not disabled at the fourth step of the sequential analysis.

VIII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 4, 2012